RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0364p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JANYCE ELAINE BROWN, Deceased; ASA
ROBERT GRAYDON BROWN, a minor child;
HELEN ELIZABETH BROWN, a minor child,
          _Plaintiffs-Appellants,_

          _v._

UNITED STATES OF AMERICA, the U.S.
Department of Veterans Affairs,
          _Defendant-Appellee._

No. 08-2506

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-73411—John Corbett O'Meara, District Judge.

Argued: July 30, 2009

Decided and Filed: October 15, 2009

Before: BATCHELDER, Chief Judge; KENNEDY and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Robert Paul Walsh, LAW OFFICE OF ROBERT P. WALSH, Battle Creek, Michigan, for Appellants. Steven P. Croley, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Robert Paul Walsh, LAW OFFICE OF ROBERT P. WALSH, Battle Creek, Michigan, for Appellants. Steven P. Croley, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge. In this suit brought under the Federal Tort Claims Act ("FTCA"), Janyce Brown and her two minor children (collectively, "appellants") appeal the district court's order granting summary judgment to the government. As the wife and children of a veteran of the first Persian Gulf War, appellants claim that the United States

1

Department of Veterans Affairs (the "VA") is liable for failing to diagnose the veteran, Arvid Brown, with a parasitic disease called Leishmaniasis and for failing to warn him that he could transmit the disease to his family. Because there is insufficient evidence that the VA owed a duty to appellants, we affirm.

## I. BACKGROUND

Arvid Walter Brown, Jr. served in the United States Army during the first Persian Gulf War. He was on active duty in Saudi Arabia from January 3, 1991 until June 4, 1991. During that time, appellants contend he contracted Leishmaniasis, a parasitic disease common in certain parts of the Middle East that is spread by the bite of infected sand flies.

Three years after he returned from active duty, on September 3, 1994, Mr. Brown married Janyce Brown. They had two children together: Asa Brown, born August 30, 1995, and Helen Brown, born June 18, 1997. Appellants allege that Mr. Brown transmitted Leishmaniasis to his wife via their daily personal and sexual contact, and that Mrs. Brown transmitted the disease to their two children *in utero*.

From 1991 until 1998, Mr. Brown received medical care from the VA for various physical and psychological problems. In 1998, the VA conducted four blood tests to determine whether Mr. Brown had Leishmaniasis.[1] All of these tests were negative.

Unaware of the tests conducted by the VA, Mr. Brown's private health care provider, Dr. Gregory Forstall, also ordered blood tests in September 1998 to determine whether Mr. Brown had Leishmaniasis. Both of these tests indicated that he was positive for the disease. A bone marrow biopsy conducted in August 1998 had indicated no parasitic infection, but it had also indicated "atypical lymphoid aggregates." Faced with what Dr. Forstall believed to be "equivocal" bone marrow results and the positive blood tests, Dr. Forstall treated Mr. Brown with a twenty-one day course of Amphotericin B. According to Dr. Forstall, he was not "clear either way" as to whether Mr. Brown in fact had Leishmaniasis. Rather, he testified that "at that point it was let's

---

[1]Leishmaniasis is diagnosed through blood testing and biopsy. Blood tests measure the presence of antibodies or antigens produced to combat the parasite. Biopsy of the spleen, liver, or bone marrow confirms the presence of the parasite.

treat him and see what happens." Another bone marrow biopsy conducted in February 1999 indicated no evidence of parasitic infection. Finally, blood tests performed in 2000 by an unnamed lab located in Rio de Janeiro, Brazil, indicated that "Arvid is for sure negative."

Unlike Mr. Brown, it is undisputed that neither Mrs. Brown nor the children ever received treatment or care from the VA or any of its medical personnel. They also were never patients of Dr. Forstall. At Dr. Forstall's direction, however, blood was collected from Mrs. Brown and the children and sent to the unidentified lab in Rio de Janeiro in 2000. The email from the lab indicated that Mrs. Brown and Asa Brown had test results that were "above the cutoff," which indicated "positivity although very discrete." Helen Brown was "just near the cut-off although considered negative." The results of a second test from the same lab apparently indicated that both Mrs. Brown and Asa Brown were negative, and that Helen Brown had a "very weak positive reaction."

On September 2, 2004, appellants filed suit against the United States under the FTCA in the United States District Court for the Eastern District of Michigan.[2] They sought damages for harm caused by Leishmaniasis, which they alleged they contracted from Mr. Brown due to the government's negligent failure to diagnose him with the disease or to warn him of the risks of transmitting it to his family. The government filed a motion to dismiss for lack of jurisdiction based upon the *Feres* doctrine, which precludes FTCA claims "for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, 146 (1950). The district court granted the government's motion and dismissed the case. On appeal, however, this court affirmed in part, reversed in part, and remanded the case to the district court. *Brown v. United States*, 451 F.3d 411, 416 (6th Cir. 2006). *Feres*, the court held, barred appellants' claims "deriving solely from military decisions incident

---

[2]On March 16, 2005, Janyce Brown died of liver cancer. Appellants do not suggest that her cancer was caused by Leishmaniasis. Instead, they limit their claim on behalf of Mrs. Brown to the seven years of disability they allege was caused by Leishmaniasis. Mr. Brown now serves as the personal representative of his wife's estate. The two minor children are also represented by the conservator of their estates. References to "appellants" in this opinion are to Janyce Brown and the two Brown children, rather than to the nominal plaintiffs.

to Arvid's service," *id.*, but it did not bar their claims "to the extent that they attribute[d] their injuries to medical examinations that took place after Arvid's discharge, and any duty to warn that arose from such examinations," *id.* at 414. Yet the court "express[ed] no opinion with respect to other possible hurdles to recovery by appellants, such as whether or not there was a duty or proximate causation." *Id.* at 415 n.3.

On remand, appellants filed an amended complaint with the district court. The government moved for a more definite statement of the factual allegations in the complaint and to strike the portions of the complaint that were irrelevant in light of this court's decision. The magistrate judge granted the government's motion and appellants filed a second amended complaint alleging the following claims: 1) failure to warn, 2) negligence, 3) medical malpractice, and 4) wrongful death of Janyce Brown. At that point, the government filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. It argued that appellants' second amended complaint did not make sufficiently specific allegations to state a claim and, even if it did, Michigan law did not recognize a general duty toward third parties such as appellants. The district court denied the government's motion.

After completion of discovery, the government moved for summary judgment. On July 15, 2008, the district court granted the government's motion. The district court first noted that appellants had abandoned their medical malpractice and wrongful death claims, a finding appellants do not contest on appeal. It then granted summary judgment to the government on appellants' remaining claims for failure to warn and negligence. Appellants filed a motion for reconsideration, which the district court denied. This timely appeal followed.

## II. ANALYSIS

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To survive a motion for summary judgment, the nonmoving party must provide evidence beyond the pleadings "set[ting] out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

## B. Liability Under the FTCA

The United States is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Accordingly, "the extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof v. United States*, 502 U.S. 301, 304-05 (1992); *see also Harris v. United States*, 422 F.3d 322, 326-27 (6th Cir. 2005). The parties do not dispute that Michigan law applies in this case because the alleged instances of the VA's negligence all occurred in Michigan. *See* 28 U.S.C. § 1346(b)(1) (providing that district courts shall have original jurisdiction of claims under the FTCA "if a private person, would be liable to the claimant in accordance with the law of the places where the act or omission occurred"). Under Michigan law, a plaintiff alleging a claim of negligence must demonstrate the following four elements: 1) a duty owed to the plaintiff by the defendant, 2) breach of that duty, 3) causation, and 4) damages. *Case v. Consumers Power Co.*, 615 N.W.2d 17, 6 (Mich. 2000).

On appeal, appellants assert that the VA owed them a duty to diagnose Mr. Brown with Leishmaniasis and to inform him of the risks of transmitting the disease to his family. The district court disagreed, holding that "[g]enerally, Michigan tort law does not recognize a duty to third parties; and the court finds no exception to that rule here, despite the unfortunate facts of this case." *Surface v. United States*, No. 04-73411, 2008 WL 2761246, at *2 (E.D. Mich. July 15, 2008).

Under Michigan law, "the question of whether a duty exists is one of law for the court's resolution." *Welke v. Kuzilla*, 375 N.W.2d 403, 250 (Mich. Ct. App. 1985).

Duty "arises from the relationship of the parties and involves a determination of whether the defendant has any obligation to avoid negligent conduct for the benefit of the plaintiff." *Duvall v. Goldin*, 362 N.W.2d 275, 277 (Mich. Ct. App. 1984). The existence of a duty is a separate inquiry from "the nature or extent of the actor's obligation" with respect to that duty. *Id.*

"Generally, a party has no duty to protect another who is endangered by a third person." *Shepard v. Redford Cmty. Hosp.*, 390 N.W.2d 239, 245 (Mich. Ct. App. 1986); *see also Welke*, 375 N.W.2d at 250. There is an exception to this general rule, however, where the defendant has a "special relationship with either the dangerous person or the potential victim." *Shepard*, 390 N.W.2d at 245; *see also Welke*, 375 N.W.2d at 250; *Duvall*, 362 N.W.2d at 278. In addition to a special relationship, whether a duty exists also depends upon "the foreseeability that the actor's conduct would create a risk of harm to the victim." *Duvall*, 362 N.W.2d at 278.

In *Shepard*, for example, a physician failed to diagnose a woman's spinal meningitis, and she subsequently passed it on to her infant son, Eric, who died two days later. The defendant hospital argued that it owed no duty to Eric because he was never a patient. The court held that a physician-patient relationship is a special relationship that may give rise to a duty of reasonable care to third parties. *Shepard*, 390 N.W.2d at 241. Thus, the physician's special relationship to Eric's mother gave rise to a duty that also extended to Eric, who was, "[a]s plaintiff's son and a member of her household," a "foreseeable potential victim of [the physician's] conduct." *Id.* Similarly, in *Welke*, the court concluded that a duty existed for the benefit of a third party where a physician injected his patient with an unknown substance, let the patient drive his vehicle, and the patient subsequently killed another individual while driving. 375 N.W.2d at 406. The third party, the court held, was "an innocent driver within the scope of foreseeable risk" by virtue of the physician's relationship with his patient. *Id.*; *see also Duvall*, 362 N.W.2d at 279 (holding that psychiatrist had duty to protect individuals endangered by his epileptic patient); *Davis v. Lhim*, 335 N.W.2d 481, 489 (Mich. Ct. App. 1983) (holding that a psychiatrist owed a duty to a person foreseeably injured by his patient).

In this case, it is undisputed that there was a special relationship between the VA and Mr. Brown, a patient. The disputed question is whether Mrs. Brown and the two Brown children were foreseeable victims of any failure on the part of the VA to diagnose Mr. Brown with Leishmaniasis.

A third party is a foreseeable victim "where [a] physician determines or, pursuant to the standard of care, should determine that his patient poses a serious threat of danger to a third person." *Welke*, 375 N.W.2d at 406; *see also Duvall*, 362 N.W.2d at 279 ("[I]t is foreseeable that a doctor's failure to diagnose or properly treat an epileptic condition may create a risk of harm to a third party."); *Davis*, 335 N.W.2d at 489 (holding that "when a psychiatrist determines or . . . should determine that a patient poses a serious threat of danger" to a third party, the psychiatrist has a duty of reasonable care to that party). We must therefore decide whether the VA should have known that Mr. Brown had Leishmaniasis and, if so, whether the VA should have also known that his infection with the disease posed a serious threat of danger to his family.[3]

First, appellants have not alleged any facts indicating that the VA should have known Mr. Brown had Leishmaniasis. A VA rating decision dated August 3, 1999, indicates that Mr. Brown presented the VA with symptoms of headaches, nausea, light sensitivity, chest pain, muscle pain, neck pain, gastrointestinal difficulties, and fatigue. But appellants have failed to offer any evidence that a reasonable physician faced with these fairly common symptoms should have determined, pursuant to the standard of care, that Mr. Brown was suffering from Leishmaniasis. Dr. Forstall, Mr. Brown's own physician, never gave any testimony to that effect. In fact, Dr. Forstall testified that Mr. Brown came to him specifically to rule out Leishmaniasis. When asked what drew him

---

[3]Obviously, it is impossible to show that the VA should have known Mr. Brown was infected with Leishmaniasis and posed a serious danger to appellants if there is insufficient evidence that he ever had the disease. Although the government maintains that Mr. Brown did not have Leishmaniasis, there is at least some evidence in the record that he did: two of his blood tests returned positive results, and Dr. Forstall testified that he believed Mr. Brown was suffering from the disease in 1998. *See* Forstall Dep. 74 (Q: "At the time that you treated Arvid Brown so this is late 1998, did you at that point believe that he in fact had leishmaniasis? . . . A: "I'd say yes."). Moreover, on February 17, 2006, the VA's Board of Veterans' Appeals found that Mr. Brown has "experienced active visceral Leishmaniasis since October 27, 1994" and was accordingly entitled to service-related disability benefits as of that date. We therefore assume for purposes of our analysis that Mr. Brown was infected with Leishmaniasis.

to the possibility of Leishmaniasis, Dr. Forstall responded, "[p]art curiosity and part just, you know, what do you have to lose." The record does not support a conclusion that the VA's physicians should have known from Mr. Brown's presentation of symptoms that he was infected with Leishmaniasis.

Even if the VA should have known that Mr. Brown had Leishmaniasis, Mrs. Brown and the two children were foreseeable victims only if the VA also should have known that Leishmaniasis posed a "serious threat of danger" to them. *Welke*, 375 N.W.2d at 406. In *Shepard*, for example, there was clearly a serious threat that the plaintiff's spinal meningitis, gone undiagnosed, would spread to Eric. *Shepard*, 390 N.W.2d at 241. Here, appellants contend that they were at risk of contracting Leishmaniasis from Mr. Brown because the disease is transmissible from person to person. Specifically, they allege that Mrs. Brown contracted Leishmaniasis from Mr. Brown through their daily personal and sexual contact, and that Mrs. Brown transmitted the disease to their children *in utero*.

On the issue of whether there was a serious risk that Mr. Brown would transmit Leishmaniasis to his wife, the government offers an affidavit from Dr. Jose Vazquez stating that "[t]o date, no form of leishmaniasis can be transmitted sexually." Vazquez Aff. ¶ 6. Appellants, however, argue that "there are many modes of transmission that could have caused Mrs. Brown's infection." They cite to medical literature documenting the spread of Leishmaniasis through needlestick injuries, oral mucosa exposure, nasal and oral secretions, urine, and the handling of contaminated specimens. But these articles describe rare and experimental transmission of Leishmaniasis, much of it occurring at low levels in mice and hamsters. One article, for example, states that "[s]exual transmission from a man to his wife has been reported" and goes on to cite only two documented probable cases of sexual transmission. Alan J. Magill, M.D., *Epidemiology of Leishmaniasis*, 13 DERMATOLOGIC CLINICS 505, 517 (1995). The same article notes only that "person-to-person transmission . . . via contact with infected fluids is theoretically possible." *Id.* Another article concluded that nasal discharge "could provide a *possible, though minor,* source of infection by body contact." Yemane B.

Mebrahtu et al., *Leishmania Donovani Parasites in the Nasal Secretions, Tonsillopharyngeal Mucosa, and Urine Centrifugates of Visceral Leishmaniasis Patients in Kenya*, 48 *Am. J. of Tropical Medicine & Hygiene* 530, 535 (1993) (emphasis added). Finally, one article found "a low level of nonvector transmission" of Leishmaniasis in mice. Alexa C. Rosypal & David S. Lindsay, *Non-Sand Fly Transmission of a North American Isolate of Leishmania Infantum in Experimentally Infected BALB/C Mice*, 91 *J. of Parasitology* 1113 (2005). This experimental and theoretical evidence does not show that the VA should have known Leishmaniasis posed a *serious* threat of danger to third parties at the time of its alleged failure to diagnose Mr. Brown with the disease.

On the issue of *in utero* transmission of Leishmaniasis, the government concedes that, "[t]hough very rare, there have been several documented cases of congenital transmission of leishmaniasis from mother to unborn child." *Id.* Indeed, one of the articles cited by appellants provides a case study of congenital transmission from a mother to her child, and notes that "[o]nly 8 cases of congenital acquired disease have been described before 1995, when our case occurred." Christoph K. Meinecke, M.D. et al., *Congenital Transmission of Visceral Leishmaniasis (Kala Azar) From an Asymptomatic Mother to Her Child*, 104 *Pediatrics* 1, 5 (1999). For the same reasons as those discussed above, however, these rare instances of congenital transmission do not indicate that there was a serious threat of danger to the two Brown children, nor do they show that the VA should have known that a serious threat of congenital transmission existed.

Because there is insufficient evidence that Mr. Brown presented the VA with symptoms of Leishmaniasis such that a reasonable physician should have known that he was infected with the disease, and because there is also insufficient evidence that the VA should have known Leishmaniasis was readily transmissible from Mr. Brown to his family members, appellants were not foreseeable victims of any failure by the VA to diagnose Mr. Brown with Leishmaniasis. Accordingly, we hold that the VA did not owe a duty to appellants under Michigan law.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to the government.