**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0192n.06

No. 13-1887

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 12, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARGARET KERNSTOCK, | ) | |
| | ) | |
| Plaintiff - Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant - Appellee. | ) | |

**Before: COLE and ROGERS, Circuit Judges; and HOOD, District Judge.**[*]

HOOD, District Judge. Plaintiff-Appellant Margaret Kernstock appeals from the summary judgment entered in favor of the Defendant-Appellee the United States of America by the district court on Kernstock's medical malpractice claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Appellant Kernstock alleges that her physician, Dr. Eventure Bernardino, learned that she had high-grade stenosis in one of her renal arteries but breached the applicable standard of care by failing to inform Kernstock or refer her to a specialist for treatment of her condition, resulting in the eventual loss of her kidney. In support of her claim, she relies upon the expert testimony of Dr. Daniel Boyle to show the proximate cause element of her medical malpractice claim. The district court found that Kernstock had not satisfied her burden of demonstrating that Dr. Bernardino

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

proximately caused her kidney loss. Consequently, the district court entered summary judgment against Kernstock on February 26, 2013, and denied her motion for reconsideration on May 9, 2013. This appeal timely followed. For the reasons that follow, this Court will affirm the district court's judgment.

## I.

Dr. Bernardino, a family physician with Health Delivery Systems, Inc. in Bridgeport, Michigan, treated Kernstock from 2004 to 2009. Kernstock filed this professional negligence claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80, against the United States because Dr. Bernardino and Health Delivery Systems, Inc. are deemed to be employees of the Public Health Service under the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233 (g)–(n).

For the first few years of her treatment with Dr. Bernardino, Kernstock's primary medical issues were high cholesterol and tobacco abuse. She was repeatedly counseled to stop smoking. In late 2005, Kernstock complained of leg pain. Dr. Bernardino ordered arterial and venous ultrasounds. Ultimately it was determined that Kernstock had peripheral artery disease (PAD).[1] Dr. Bernardino explained this to Kernstock and recommended that she quit smoking, continue to take aspirin, watch her diet, and exercise regularly. Dr. Bernardino discussed ordering an arteriogram and possible referral to a vascular surgeon if her condition did not improve with these steps.

---

[1]Evidence in the record refers to peripheral vascular disease (PVD) and peripheral artery disease (PAD). [R. 54-2, Page ID 524; *see* R. 46-10, Page ID 241]. Dr. Maheshwari testified that peripheral vascular disease is the more general form and covers disease in both veins and arteries. [R. 54-2, Page ID 524]. Peripheral artery disease specifically refers to the arteries. [R. 54-2, Page ID 524]. Although Kernstock's records refer to PVD in many instances, the more specific "PAD" will be used herein.

2

Kernstock continued to see Dr. Bernardino in December 2006, as well as March, October, and December 2007. She was referred to Dr. Sullivan for her PAD in April 2007. Throughout her conferences with Drs. Bernardino and Sullivan she was advised to stop smoking as smoking would exacerbate her PAD symptoms.

In June of 2008, Dr. Alok Maheshwari, an interventional cardiologist at the Michigan CardioVascular Institute, saw Kernstock on a referral from Dr. Bernardino to evaluate her lower extremity pain, specifically, pain in her legs after walking. Dr. Maheshwari ordered an ultrasound, which indicated possible blockages in the arteries of both of Kernstock's legs. Subsequently, a CT angiogram was performed on June 25, 2008, which revealed "mild proximal renal artery stenosis" in the right artery and a "high grade proximal left renal artery stenosis" in addition to blockages in the arteries in both legs. [R. 46-26, Page ID 305–06; R. 54-2, Page ID 528]. Although Kernstock had normal renal function in June and August 2008, Dr. Maheshwari testified that the CT scan revealed an 80 percent blockage of the left side of the left renal artery. Following this and other tests, Dr. Mahashwari concluded that Kernstock suffered from bilateral lower extremity PAD. Dr. Mahashwari referred her to a surgeon for further treatment for her PAD. Because Kernstock had been repeatedly counseled about smoking cessation and was already taking cholesterol-lowering medication and aspirin, Dr. Maheshwari did not see any need for additional treatment. Everything that he would have recommeded for treatment was already being done. Although Kernstock had been referred to him for treatment of her PAD, rather than renal stenosis, Dr. Mahashwari later testified that if he had seen her on a specific recommendation for renal stenosis, he would not have recommended any treatment other than that already prescribed at that time. Dr. Mahashwari

3

testified that smoking is the leading risk factor for atherosclerosis[2] resulting in narrowing of the renal artery. Kernstock continued to smoke throughout the time that she was treated by Dr. Bernardino, although the records indicate that she stopped smoking at some point in January 2009, prior to transferring her treatment to another physician. At the time the tests were performed, the renal stenosis was not clinically significant and her kidney function was normal. After the CT scan revealing renal artery stenosis, Dr. Bernardino saw Kernstock in October, November, December 2008, and January 2009. During these appointments, Dr. Bernardino's notes indicate that they discussed her medical treatment and that she was counseled to quit smoking, but the notes are silent regarding renal stenosis.

Kernstock testified that she was never informed that the tests had revealed renal artery stenosis. For purposes of the summary judgment motion, Defendant-Appellee concedes that Dr. Maheshwari provided Dr. Bernardino with a copy of the results of the August 23, 2008 CT scan, and that those results were not shared with Kernstock.

At the January 19, 2009 appointment, Kernstock presented with a headache and high blood pressure. Dr. Bernardino prescribed hydrochlorothiazide to treat her high blood pressure, ordered additional diagnostic tests, and scheduled a follow-up visit in one week. The next day, Kernstock

---

[2]The transcript of Dr. Maheshwari's testimony uses the term "arthrosclerosis." [R. 54-2, Page ID 523]. However, "arthrosclerosis" is a "stiffening or hardening of the joints." *See Dorland's Illustrated Medical Dictionary* 142 (28th ed. 1994). This is a scrivener's error. Based on Dr. Maheshwari's use of the terms "atherosclerotic" disease and plaque in Kernstock's records, "atherosclerosis" appears to be the correct term and it will be used herein. [R. 54-2, Page ID 555]; *See What is Atherosclerosis?*, National Heart, Lung, and Blood Institute, https://www.nhlbi.nih.gov/health/health-topics/topics/atherosclerosis/ (last updated July 1, 2011) ("Atherosclerosis . . . is a disease in which plaque . . . builds up inside your arteries.").

called complaining of gastric symptoms that she attributed to the new prescription of hydrochlorothiazide. Dr. Bernardino prescribed lisonopril instead.

The following day, January 21, 2009, Kernstock went to the emergency room of St. Mary's of Michigan complaining of dizziness, blurred vision, abdominal pain and a tingling sensation in both arms. After examination she was admitted for testing and consultation with several physicians. The records indicate that the physicians at St. Mary's had access to, or were aware of, the findings of Kernstock's earlier test results, including the earlier finding of renal stenosis. One of her consultations during her hospital stay was with Dr. Peter Fattal, an invasive cardiologist affiliated with MCVI. Dr. Fattal reviewed the records and examined Kernstock, but did not recommend any treatment for what he termed Kernstock's "mild renal insufficiency."

On the evening of January 22, 2009, Kernstock requested discharge. She was eventually discharged from the hospital against medical advice. The discharge sheet indicated that Kernstock had "acute renal failure," as well as several other issues. [R. 47-1, Page ID 358]. She was to be followed "on an outpatient basis to assess her possible need for renal replacement therapy," but at the time of her discharge she was "doing fine." [R. 47-1, Page ID 358]. Dr. Pawlaczyk, who signed off on the discharge documents, also noted, among her other diagnoses and treatment plans, that "[i]t is likely that this [acute renal failure] was caused by the hypotension and with her rehydration, her renal function would return to normal." [R. 47-1, Page ID 358].

Instead of returning to Dr. Bernardino for her scheduled appointment, Kernstock transferred her care to AGES Senior Health Care. Subsequently, Kernstock underwent a bilateral renal angiogram on February 20, 2009, which revealed that her "left renal artery [was] 100% occluded. This is a new finding. Last year left renal artery was 80% stenosed." [R. 47-3, Page ID 363].

5

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "[T]he district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  *Strayhorn v. Wyeth Pharm., Inc.*, 737 F.3d 378, 387 (6th Cir. 2013) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Central to the analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  This Court reviews the district court's decision to grant summary judgment de novo.  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 486–87 (6th Cir.  2006) (citing *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005)).

## III.

Under the FTCA, the United States may be found liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  Thus, "the extent of the United States' liability under the FTCA is generally determined by reference to state law."  *Brown v. United States*, 583 F.3d 916, 919–20 (6th Cir. 2009) (quoting *Molzof v. United States*, 502 U.S. 301, 305 (1992)).  Because all of the alleged acts and omissions occurred in the state of Michigan, its laws apply.  *Id.* at 920; *see also* 28 U.S.C. § 1346(b)(1).

In *Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296 (Mich. 2004), the Supreme Court of Michigan held:

> In order to establish a cause of action for medical malpractice, a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the

6

plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care.

*Id.* at 308 (citing *Weymers v. Khera*, 563 N.W.2d 647, 652 (Mich. 1997)). The issue is whether Kernstock has brought forward sufficient evidence to demonstrate that her injuries were the "proximate result" of Dr. Bernardino's breach of the standard of care.

As evidence that Dr. Bernardino's breach of the applicable standard of care was the proximate cause of Kernstock's kidney damage and, ultimately, kidney failure, Kernstock offers the opinions and testimony of a board certified family practitioner, Dr. Daniel Boyle. Dr. Boyle testified that Dr. Bernardino breached the applicable standard of care when he received the results from Dr. Maheshwari's imaging study indicating that Kernstock had renal stenosis, but failed to "make an appropriate referral in order that the patient's renal function be preserved . . . ." [R. 54-3, Page ID 570–71]. Based on his experience with approximately five to ten patients, Dr. Boyle testified that if Kernstock had been referred to a specialist, the specialist would have stented her renal artery and preserved her kidney function. Before the district court, Kernstock had also argued that it was a breach of the standard of care for Dr. Bernardino to "prescribe, first, an ACE inhibitor [lisinopril] and, second, a diuretic because those things can adversely affect renal function in somebody with known renal artery stenosis," [R. 54-3, Page ID 571], but that argument has been waived because it was not raised before this Court. *See Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) ("We consider issues not fully developed before this Court to be waived.").

The district court, noting that Dr. Boyle relied only on his anecdotal experience with a handful of patients over the years, found that Dr. Boyle's testimony was based on a series of assumptions that may or may not have applied to Kernstock's treatment had she been referred to a specialist. Dr. Boyle's testimony, alone, was not sufficient evidence to "exclude other reasonable

7

hypotheses with a fair amount of certainty" to show proximate cause and, as a result, the district court granted summary judgment for Defendant-Appellee. *Craig*, 684 N.W.2d at 309. Kernstock argues that the district court's conclusion meant the court had "disregarded the causation testimony from Dr. Boyle, [] a general practitioner, finding that testimony from a specialist was required in order to demonstrate the existence of proximate cause," and that the district court improperly relied on MCL 600.2169 to dismiss Dr. Boyle's testimony. [Appellant Br. at 18]. Kernstock argues that the district court improperly weighed the evidence before it on the proximate cause issue by disregarding Dr. Boyle's testimony, and by giving weight to the opinion of treating physicians Drs. Maheshwari and Fattal. However, the district court did not improperly weigh the evidence before it. Instead, Kernstock did not present sufficient evidence to show that Dr. Bernardino's failure to refer her to a specialist for renal artery stenosis proximately caused her renal failure.

Kernstock argues on appeal that the district court, improperly relying upon MCL 600.2169, found that testimony from a specialist was required to show proximate cause. Kernstock cites *Jones v. Pramstaller*, 874 F. Supp. 2d 713, 722–23 (W.D. Mich. 2012), for her argument that as a general practitioner, Dr. Boyle is qualified to testify about causation under Fed. R. Civ. P. 702. Kernstock misinterprets the rationale of the district court. Dr. Boyle's testimony was not discredited by the district court, nor is this Court discrediting his opinion. Even assuming that his testimony is admissible under Fed. R. Civ. P. 702, as this Court has, and giving Dr. Boyle's testimony its full weight, Dr. Boyle's testimony alone is insufficient to demonstrate proximate cause as a matter of law.

Proximate cause encompasses both cause in fact and legal cause. *Craig*, 684 N.W.2d at 309 (citing *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994)). "The cause in fact element

8

generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Skinner*, 516 N.W.2d at 479 (citations omitted). A court must first examine whether defendant's negligence was a cause in fact of the plaintiff's injuries before turning to whether defendant's negligence was the proximate, or legal, cause. *Craig*, 684 N.W.2d at 309 (citing *Skinner*, 516 N.W.2d at 479). Assuming that Dr. Boyle was qualified to testify as an expert in this matter, and accepting his testimony and all reasonable inferences from that testimony in favor of Kernstock, Dr. Boyle's testimony does not sufficiently demonstrate that Dr. Bernardino's failure to refer Kernstock to a specialist for renal artery stenosis treatment resulted in her kidney failure.

Dr. Boyle does not treat renal artery stenosis. He estimated that somewhere around five or ten of his patients have been given this diagnosis over the course of his 38 year career. In each case, they were treated by use of a stent. Although these patients are not necessarily still under his care, Dr. Boyle believes that their renal function was preserved in each case for some time. He testified that "I'm sure in my own mind, I've determined that they need a stent, but I rely on my specialists to do whatever they think needs to be done. For example, there may be some new procedure that I don't know anything about, and that they would utilize that procedure." [R. 54-3, Page ID 567]. In other words, in his own practice, Dr. Boyle leaves the decision about how best to treat renal stenosis to a specialist, but he knows that all of his patients he referred had received stents and were doing okay. Nonetheless, Dr. Boyle testified that he believed, to a reasonable degree of medical certainty, that if Kernstock had been referred to a specialist, she would have been stented in or

9

around October 2008, and that "[Kernstock] would have had a normal and viable kidney . . . [which] would be functioning as we sit here today." [R. 54-3, Page ID 590].

There must be more than Dr. Boyle's bald testimony that he believed if Kernstock had been stented in or around October 2008, Kernstock's kidney would have continued to function. Michigan law requires that "there must be facts in evidence to support the opinion testimony of an expert." *Skinner*, 516 N.W.2d at 484 (citing *Mulholland v. DEC Int'l Corp.*, 443 N.W.2d 340, 347 (Mich. 1989)). "[T]he requirement is affirmative: plaintiff must provide sufficient evidence to establish a reasonable inference of a logical sequence of cause and effect, and not merely speculate[] on the basis of a tenuous connection . . . ." *Teal v. Prasad*, 772 N.W.2d 57, 62 (Mich. Ct. App. 2009) (quoting *Craig*, 684 N.W.2d at 309) (internal quotation marks omitted). This is where Kernstock's argument fails. At best, Dr. Boyle bases his testimony on prior patients, evidence which is speculative and evidences little more than a correlation among his patients. "It is axiomatic in logic and in science that correlation is not causation." *Craig*, 684 N.W.2d at 312 (citations omitted). Dr. Boyle testified that each of his patients he referred for renal stenosis was given a stent, but he offers no rationale for why that decision was made, what factors were weighed, whether those patients were similar to Kernstock in age, family history, smoking history, or any other factors. Dr. Boyle has not provided any information that would be helpful in ruling out another course of treatment. Dr. Boyle does not refer to or indicate that he relied on any evidence such as publications or percentage of renal stent success rates. He did not discuss factors that would play into the decision to undergo a stent procedure. There is no information as to whether these anecdotal cases were similar to Kernstock's and whether Kernstock could have expected similar results.

10

An "expert opinion based only on hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and injury." *Skinner*, 516 N.W.2d at 484. It is not that Dr. Boyle is not qualified to testify in this matter – that question is not before us[3] – it is that his opinion and the facts that he uses to support it are insufficient as a matter of law to "exclude other reasonable hypotheses with a fair amount of certainty." *Craig*, 684 N.W.2d at 309.

Specifically, Dr. Boyle's testimony is insufficient to exclude with a fair amount of certainty the probability that a referral to a specialist for renal stenosis would not have saved Kernstock's kidney. In contrast, Dr. Maheshwari testified that Kernstock would have received the same treatment from a specialist as she was receiving from Dr. Bernardino. Medical treatment for atherosclerosis, Dr. Maheshwari testified, would depend on the risk factors for atherosclerosis. Smoking, hypertension, diabetes and high cholesterol levels are the risk factors that would have been addressed at the time of treatment. Smoking is the leading risk factor. Dr. Maheshwari testified that interventional treatment, such as a stent or balloon, "is rarely, rarely necessary for renal artery stenosis." [R. 54-2, Page ID 523]. He went on to discuss three general indications where interventional treatment may be warranted, such as hypertension or poorly controlled blood pressure, recurrent flash pulmonary edema, or kidney dysfunction that is unexplained by another reason. Similarly, Dr. Fattal saw Kernstock during the time she was in the hospital. He was aware of her renal stenosis and, at that time, her decreased kidney function, but he did not prescribe any additional treatment for her renal stenosis either. Thus, evidence in the record does not suggest that referral to a specialist would have resulted in treatment other than what she was already receiving,

---

[3]Defendant-Appellee's Motion to Exclude Dr. Boyle was denied as moot when summary judgment was granted.

which was medication and advice to stop smoking. Kernstock has not shown "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Skinner*, 516 N.W.2d at 480.

Kernstock argues that, because the renal stenosis was outside the scope of the original referral to Dr. Maheshwari, the fact that Dr. Maheshwari did not recommend a stent for Kernstock's renal stenosis is of no value to this analysis. It is relevant, however, that Dr. Maheshwari later testified that interventional treatment, such as a stent or a balloon, is "rarely, rarely necessary," and that he did not recommend anything other than what was already being done because Kernstock was already on the correct medications and had been counseled to stop smoking. [R. 54-2, Page ID 533].

Dr. Maheshwari's testimony is squarely at odds with Dr. Boyle's opinion that Kernstock's referral to a specialist would have certainly resulted in a stent and the preservation of Kernstock's kidney. Nonetheless, Kernstock does not have to demonstrate that Dr. Maheshwari's testimony is wrong, or that Dr. Boyle's opinion as to cause is necessarily correct. She does not have to negate the other causes. It is Kernstock's burden, however, to show that her kidney failure would not have occurred if she had been referred to a specialist for treatment of her renal artery stenosis. *Craig*, 684 N.W.2d at 309. Instead, the evidence from two specialists indicates that if Kernstock had been referred to a specialist for specific treatment for her renal stenosis, the specialist would not have suggested any additional treatment. Dr. Boyle's testimony is not sufficient to conclude that her kidney would still be functioning if she had been referred to a specialist. "A mere possibility of such causation is not enough; and when . . . the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Skinner*, 516 N.W.2d at 481 (citations

12

omitted).  Kernstock has not come forward with sufficient evidence at this stage to show proximate

cause and defeat summary judgment.  *Craig*, 684 N.W.2d at 309 (*Skinner*, 516 N.W.2d at 481).

## IV.

For all of the  reasons stated above, we **AFFIRM** the district court's judgment.